**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| **United States of America,** | **Criminal No. 05-CR-234** |
| | **(MJD/SRN)** |
| **Plaintiff,** | |
| **v.** | **REPORT AND RECOMMENDATION** |
| **Daniel Lee Bacote** | |
| **Defendant**. | |

---

Andrew Dunne, Esq., on behalf of Plaintiff

Lee Johnson,  Esq., on behalf of Defendant

---

SUSAN RICHARD NELSON, United States Magistrate Judge

The above entitled matter came before the undersigned United States Magistrate Judge on

Defendant's Motion to Suppress (Doc. No. 40).[1]

This matter is set to be tried before the Honorable Michael J. Davis, United States District

Court Judge for the District of Minnesota, on June 12, 2006.   This case has been referred to the

undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

**I.      FACTS**

An Indictment was filed on November 10, 2005, charging Defendant with one count of

---

[1]Defendants' non-dispositive motions were addressed in a separate Order.

possession with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and

841(b)(1)(B).  (Indictment, Doc. No. 1.)

The following witnesses, all members of the Minneapolis Police Department, testified for the

Government at the criminal motions hearing: Sergeant Daniel Pommerenke, Officer Jonathan Hoff and

Officer Gene Suker.

The Court received the following exhibit in evidence:

(A)     Government Exhibit 1: Arrest warrant for Defendant.

(See Criminal Motions Hearing Exhibit and Witness List, Doc. No. 56.)

Sergeant Pommerenke testified that on August 30, 2005, he participated in a prostitution detail

in the area of 19th Avenue and Lake Street in Minneapolis.  Officers chose this location due to citizen

and business complaints about the solicitation of prostitutes in the area.  The detail consisted of an

undercover officer, Christie Nelson, who posed as a prostitute and wore a wire; plain clothes officers

who conducted surveillance and monitored her visually; and uniformed officers in nearby marked cars

who would transport any suspects to the precinct station.  Sergeant Pommerenke monitored Officer

Nelson and could hear any conversations she might have with potential customers.

At approximately 6:40 p.m., a white Range Rover pulled over near the undercover officer and

she approached the vehicle.  Sergeant Pommerenke observed the interaction, but because of the

Ranger Rover's tinted windows, he could not determine how many occupants were inside.  As the

undercover officer approached, the back seat passenger, Defendant Bacote, exited the Range Rover

and traded places with the front seat passenger.  Defendant then sat in the front passenger seat of the

vehicle.  The undercover officer and the back seat passenger negotiated prices for various sex acts.

The back seat passenger indicated that the price was just for him, not for all of the occupants of the

Range Rover.  The back seat passenger asked the undercover officer to lift up her shirt to see if she

was a police officer wearing a wire.  The undercover officer refused, stating that she was cold.  The

undercover officer and the back seat passenger continued their explicit discussion about prices for sex

acts and the back seat passenger instructed the undercover officer to get into the Range Rover.

Sergeant Pommerenke testified that he heard other voices from inside the car telling her to get inside.

When she hesitated, the back seat passenger got out of the Range Rover and approached the

undercover officer, yelling at her to get into the car.   Sergeant Pommerenke testified that the front seat

passengers made no comments after the back seat passenger got out of the car.

       The undercover officer's police report, read into the record at the motions hearing, provides the

following account:

> I asked the back seat passenger ***, "Whatcha lookin' for?  Lookin' to party?"  He
> replied, "Yeah."  He then asked me for my name.  I told him my name was Isabela.  He
> extended his hand to me and shook my hand.  I again asked him what he wanted.  I
> asked him if it was just [him] that was looking for anything or if the front seat wanted
> anything.  He said, "Just me."  He replied, "Everything."  I said, "Everything." and he
> agreed.  I asked him, "Sex and a blow job?" – and in parentheses, oral sex – "for
> $40." . . . I then told him that it was "$20."  When I was explaining the price of the sex
> act, he was trying to get me into the vehicle several times by saying, "Get in."  He then
> told me to take off my top to prove that I was not a cop.  I then told him that I "was
> cold."  I then asked him if he was a cop.  The front seat passengers and the back seat
> passenger were all talking and telling me to get inside of the vehicle. [The back seat
> passenger] . . . was patting the empty seat next to him as he sat behind the driver. [The
> back seat passenger] continued to say, "Listen, hop in and we'll . . ."  He then stepped
> out of the vehicle and continued to get me into the vehicle.  As he began to walk closer
> to me, I felt scared that he was going to grab me and throw me into the vehicle against
> my will.  When the marked squad arrived, I left the immediate area.

(Transcript of 3/6/06 Hearing at 22-23, Doc. No. 57.)

Sergeant Pommerenke then decided to bring in the marked squad cars, out of concern for the undercover officer's safety.

Officers Hoff and Suker were part of the detail assigned to arrest any suspected parties. Officer Suker testified that Sergeant Pommerenke instructed him to arrest the occupants of the Range Rover. Within seconds, Officer Hoff activated the lights of his marked police car and pulled behind the Range Rover. As Officer Hoff approached on the driver's side, the undercover officer walked away and the back seat passenger, who had been outside talking with the undercover officer, jumped in the back passenger side of the Range Rover and closed the door. Through the tinted windows in the back of the Range Rover, Officer Hoff observed the back seat passenger reaching up for something behind him. Fearing for his safety, Officer Hoff tried to open the back driver's side door, but it was locked. Several times, he told the driver to unlock the door. When the driver failed to respond, he drew his weapon, pointing it downward at his side. When the door was unlocked eventually, Officer Hoff ordered the front seat passengers to put their hands up and escorted the back seat passenger to the squad car.

Officer Suker, who had also received the "take down" signal, arrived and parked his squad car behind Officer Hoff's car. Officer Hoff was dealing with the back seat passenger when Officer Suker approached the passenger side of the Range Rover.

Officer Suker observed Defendant in the front passenger side and ordered him to get out and put his hands on top of the Range Rover. Officer Suker explained that this was for officer safety. Defendant complied. Sergeant Pommerenke, who was observing the scene, noted that Defendant appeared nervous and warned another officer, "Get ready because he's going to run if he can." Sergeant Pommerenke observed that Defendant had a CD case/fanny pack slung around his neck .

Officer Suker stood back a few steps so as to observe both Defendant and the driver.  Because he saw

the driver appear to reach behind his seat, Officer Suker looked inside the Range Rover.  At this point,

Defendant pushed off the Range Rover and ran south in a nearby alley.  Sergeant Pommerenke testified

that Defendant appeared to attempt to remove something from his waist.

Officer Suker chased Defendant down the alley.  Officers communicated with each other during

the pursuit, but approximately half-way down the alley, Officer Suker's radio communication device

popped out of its holster, causing him to fumble briefly while retrieving it.  He observed Defendant turn

east, then out of his view temporarily.  Officer Suker next saw Defendant jump a fence between two

houses and run toward him.  Defendant held a gun in his right hand and Officer Suker drew his own

gun.  Defendant then turned around and continued to run.  Officer Suker saw  Defendant throw his gun

into a trash can, and Officer Suker retrieved it, knowing that other officers were assisting in the chase.

Officers eventually apprehended Defendant and placed him under arrest.  Officers recovered a black

fanny pack that was in Defendant's possession when he fled from the Range Rover.  It was not

recovered from his person, but was found was in the proximity of where Defendant was arrested.  The

fanny pack contained methamphetamine and ecstasy.

Officer Suker transported Defendant to the police station.  En route, and prior to receiving any

Miranda warning, Defendant volunteered that he wished that officers had killed him.  He also stated that

he had been called by the two other parties in the Range Rover to deliver dope to them.  Officer Suker

asked Defendant if he had a permit to carry the gun that he threw away and he replied that he did not.

When officers returned to the police station, they learned of an outstanding federal arrest warrant for

Defendant (Govt. Ex. 1.)

## II.      DISCUSSION

### A.       Probable Cause for Arrest

Defendant argues that officers lacked probable cause to arrest him.  First, he argues that the

officers had no probable cause to arrest anyone in the vehicle, because the back seat passenger never

accepted the undercover officer's offer of sex for money.  Second, Defendant contends that officers

had no information that he was committing a crime. Defendant notes that only the back seat passenger

ever negotiated with the undercover officer for sex. He cites the testimony of Sergeant Pommerenke

that, when the officers homed in on the Range Rover, they had probable cause only to arrest the back

seat passenger and to merely identify the other occupants of the vehicle.   Accordingly, Defendant

argues that there was no information that might permit an objectively reasonable officer to believe that

Defendant had committed a crime.

Probable cause to obtain a warrantless arrest exists when police have, at the moment of arrest,

knowledge of facts and circumstances grounded in reasonably trustworthy information and sufficient in

themselves to warrant a belief by a prudent person that an offense has been or is being committed by

the person to be arrested.  See Beck v. Ohio, 379 U.S. 89, 91 (1964); Brinegar v. United States, 338

U.S. 160, 175-76 (1949).  The personal observations of officers may establish probable cause.  Police

observation may range from a single officer observing an isolated incident to elaborate surveillance by

teams of investigators.  See Pennsylvania v. Labron, 518 U.S. 938, 939 (1996); McDonald v. United

States, 335 U.S. 451, 454-55 (1948).   Police may use their experience, special training and expertise

to draw limited inferences of criminal activity from behavior that is not facially criminal.  Texas v.

Brown, 460 U.S. 730, 742-43 (1983); United States v. Terriques, 319 F.3d 1051, 1056 (8th Cir.

2003).  A finding of probable cause may be based on the collective knowledge and information of all of

the officers involved.  United States. v. O'Connell, 841 F.2d 1408, 1419 (8th Cir.), cert. denied, 487

U.S. 1210 (1988).

In support of his argument about lack of probable cause for his arrest, Defendant cites Sergeant

Pommerenke's testimony in which he stated that at the time officers approached the Range Rover, they

only had probable cause to arrest the back seat passenger.  Officer Suker, however, stated that

Sergeant Pommerenke instructed him to arrest all of the occupants of the Range Rover.

Regardless of Sergeant Pommerenke's subjective belief about probable cause or his directive

to Officer Suker to arrest all of the occupants of the Range Rover, one fact is critical – Defendant was

not placed under arrest upon exiting the vehicle.  Officer Suker asked Defendant to exit the Range

Rover and to place his hands on the vehicle for officer safety.  He did not state that Defendant was

under arrest.  In fact, no arrest could have occurred, because within moments, Defendant pushed off

the car and fled.  Defendant's "unlawful arrest" argument,  focusing on the existence of probable cause

as to the underlying solicitation offense is therefore an academic exercise not supported by the facts.

Defendant was not under arrest – lawful or unlawful – at the time he fled the scene.  Once Defendant

fled from police and pulled out a gun, however, the officers certainly had probable cause to arrest him.

See United States v. Dawdy, 46 F.3d 1427, 1430 (8th Cir. 1995), cert. denied, 516 U.S. 872 (1995).


**B.      Investigative Stop**

As to the stop of the Range Rover, the officers had reasonable suspicion of criminal activity to

justify an investigative stop.  An investigatory detention, a brief seizure by police based on reasonable

suspicion of criminal activity, is a "narrowly drawn" exception to the Fourth Amendment's probable

cause requirement.  See Terry v. Ohio, 392 U.S. 1, 26 (1968).  In Terry, the Supreme Court held that

a police officer may stop a person who is reasonably suspected of criminal activity, question him briefly,

and perform a limited pat-down search for weapons.  Id. at 22-24.  Law enforcement officers must

have a reasonable, articulable suspicion of criminal activity in order to initiate an investigatory detention,

or Terry stop.  Id. at 21-22.  To meet this standard, the government must point to specific and

articulable facts, together with rational inferences drawn from those facts, that reasonably suggest

criminal activity has occurred or is imminent.  Id. at 21.  An officer may rely on the information known

by a team of officers involved in an investigation to provide justification for a stop.  United States v.

Ortiz-Monroy, 332 F.3d 525, 529 (8th Cir. 2003), citing United States v. Robinson, 119 F.3d 663,

666-67 (8th Cir. 1997).

    Here, the officers had reasonable suspicion to believe that the occupants of the Range Rover

were involved in soliciting a prostitute.  The Range Rover pulled over near where the undercover officer

was standing.  The occupants of the vehicle switched seats to facilitate the transaction.   The back seat

passenger and the undercover officer had graphic discussions about the performance of sex acts for

money.  The occupants of the vehicle urged the undercover officer to get into the car.  The back seat

passenger even exited the Range Rover in order to persuade the undercover officer to enter the vehicle.

 Other officers observed the foregoing events either visually or by monitoring the wire, or both.  Based

on all of the facts, the officers had specific and articulable facts, taken together with reasonable

inferences from those facts, to conclude that the occupants of the Range Rover were engaged in

criminal activity.  Thus, the officers could conduct a lawful investigative detention of the vehicle and its occupants under <u>Terry</u>.

As to the scope of the detention, the range of police activities permitted during an investigatory detention must be reasonably related to the circumstances that initially justified the detention.  <u>See</u> <u>United States v. Sharpe</u>, 470 U.S. 675, 682 (1985); <u>Terry</u>, 392 U.S. at 20.  If reasonable suspicion exists, police may detain a person to ascertain his or her identity.  <u>Terry</u>, 392 U.S. at 22-23.  Police may also order occupants out of a vehicle they have lawfully detained, whether or not the police have reasonable suspicion that the occupants have engaged in criminal activity.

Under <u>Terry</u>, when police reasonably suspect that a person is engaged in criminal activity, they may stop that person for a limited period of time, and frisk that person for weapons.  <u>Terry</u>, 392 U.S. at 222-24.    The test under <u>Terry</u> is an objective standard: the officer need not be absolutely certain that the suspect is armed, but must establish that a reasonably prudent man in the circumstances would be warranted in the belief that his safety or the safety of others was in danger.  <u>United States v.</u> <u>Roggeman</u>, 279 F.3d 573, 577-78 (8th Cir. 2002) (citations omitted), <u>cert.</u> <u>denied</u>, 537 U.S. 879 (2002).  "The sole justification of the search . . . is the protection of the police officer, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer."  <u>Terry</u>, 392 U.S. at 29.  Any weapons found may be seized and may be introduced in evidence against the person from whom they were taken.  <u>Id.</u> at 29-30.

In this case, Officer Hoff observed the back seat passenger reaching behind him in the vehicle.

For officer safety, he ordered the occupants to put their hands up where he could see them and directed the driver to unlock the doors. The driver failed to comply after several requests, so Officer Hoff drew his weapon, but pointed it downward toward the ground. The driver eventually complied and unlocked the doors. At the same time, Officer Suker directed Defendant to exit the Range Rover and put his hands on the vehicle. Defendant complied, but Officer Suker observed the driver reaching around his seat. Concerned for his safety, Officer Suker looked into the Range Rover to ascertain whether the driver had a weapon. As he was looking inside, Defendant fled.

The officers did not violate the scope of a Terry stop. Both officers reasonably feared for their safety based on the furtive movements inside the Range Rover and the initial refusal to comply with Officer Hoff's request to unlock the doors. Accordingly, Defendant's motion to suppress based on the scope of the stop should be denied.

### C.    Flight/Inevitable Discovery

Defendant contends that his flight from police occurred almost immediately after his illegal arrest, which weighs in favor of suppression of the evidence. ((Def.'s Supp'l Mem. at 7, citing Minnesota v. Olson, 634 N.W.2d 224, 229 (Minn. App. 2001)). He argues that his flight from an illegal arrest does not constitute an intervening circumstance sufficient to dissipate the taint of his illegal arrest. (Def.'s Supp'l Mem. at 8.) The Government argues that had Defendant not fled, the officers would have inevitably discovered the handgun and narcotics in Defendant's possession pursuant to a lawful search incident to arrest because of an outstanding federal arrest warrant for Defendant.

Having determined that Defendant was not arrested until after his flight from police, the Court

need not address Defendant's intervening circumstances argument.  Turning to the Government's

position, under the "inevitable discovery" exception to the exclusionary rule, the Court may admit

unlawfully obtained evidence if the challenged evidence would have been discovered through other

lawful means.  Nix v. Williams, 467 U.S. 431, 440-50 (1984); Hamilton v. Nix, 781 F.2d 619, 625

(8th cir. 1985), cert. denied, 483 U.S. 1023 (1987).  In Nix v. Williams, the Supreme Court held that

evidence concerning the location and condition of a murder victim's body was admissible even though

the police obtained this information in violation of the defendant's Sixth Amendment right to counsel.

467 U.S. at 446-47.  The Court reasoned that a comprehensive search already under way at the time

of the police illegality would have inevitably resulted in the discovery of the body.  Id. at 448-50.

As noted above, this Court has concluded that the police conduct was lawful.  In any case, the

Court agrees that even if the officers' conduct had been unlawful, Defendant would have been arrested

due to the outstanding federal arrest warrant. (Govt. Ex. 1.)  Sergeant Pommerenke testified that

following Defendant's arrest, officers learned of the outstanding warrant.  He also testified that had

Defendant not fled, officers would have identified the occupants of the Range Rover at the scene,

learned of Defendant's federal warrant and taken him into custody.  During a standard search incident

to arrest, see New York v. Belton, 453 U.S. 454, 461 (1981), officers would have inevitably

discovered Defendant's handgun and narcotics.  Accordingly, even if the police officers' conduct had

been unlawful, officers would have discovered the contraband on Defendant's person.  Therefore, as to

Defendant's motion to suppress based on intervening circumstances, the Court recommends that it be

denied.

**D.      Suppression of Statements, Admissions and Answers**

Defendant seeks to suppress all statements, admissions and answers on Fourth, Fifth and Sixth

Amendment grounds.  (Doc. 40, Def.'s Mot. Supp. at 1-2.)  Defendant made the three statements at

issue while Officer Suker transported him to the police station.  Defendant had been arrested, but had

not received a Miranda warning.  According to the officer's testimony, Defendant voluntarily made two

statements: (1) that he wished that officers would have killed him; and (2) that the other two parties in

the Range Rover had called him to deliver some dope.  Finally, Officer Suker asked Defendant if he

had a permit for the gun that he threw away.  In response to the officer's question, Defendant stated

that he did not.    (See Tr. at 59-60, Doc. 57.)

Defendant argues that his statements should be suppressed because he was unlawfully in

custody under the Fourth Amendment  This Court has already concluded that Defendant was lawfully in

custody under the Fourth Amendment.  Thus, his fruit of the poisonous tree argument, pursuant to Won

Sun v. United States, 371 U.S. 471 (1963), is unavailing for the reasons discussed herein.

Defendant also challenges the admissibility of any statements under the Fifth Amendment.  The

Fifth Amendment privilege against self-incrimination protects individuals from being forced to testify

against themselves.  U.S. Const. amend. V.  Miranda warnings must be given before any interrogation

of a suspect in custody may take place.  Miranda v. Arizona, 384 U.S. 436, 460-61 (1966).  Before

the government may introduce in its case-in-chief an incriminating statement made by a defendant, it

must prove a voluntary, knowing and intelligent waiver of the accused's rights under the Fifth

Amendment.  Id. at 475.

Regarding Defendant's in-custody statements that 'he wished the officers would have killed him,' and that he was with the parties in the Range Rover to deliver drugs to them, they were volunteered.  There is absolutely no evidence that Officer Suker exerted any pressure in order to elicit such statements.  A volunteered statement is admissible against a defendant: "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding." See Miranda, 384 U.S. at 479; see also, United States v. Samuels, 938 F.2d 210 214 (D.C. Cir. 1991) (volunteered and spontaneous statements are admissible without Miranda warnings if not made in response to police questioning.)

"Routine booking" questions are not considered interrogation and therefore do not require Miranda warnings.  Pennsylvania v. Muniz, 496 U.S. 582, 600-02 (1990); see United States v. Jones, 266 F.3d 804, 812 (8th Cir. 2001) (holding that request for routine identification information was not interrogation); but see, e.g., United States v. Scott, 270 F.3d 30, 44 (1st Cir. 2001) (questions about age and residence were interrogation not fitting routine booking exception because officer knew answers would likely produce inculpatory information), cert. denied, 535 U.S. 1007 (2002); United States v. Henley, 984 F.2d 1040, 1042-43 (9th Cir. 1993) (officer asking whether suspect owned vehicle was interrogation when officer had reason to believe vehicle was involved in illegal activity.). Asking whether Defendant possessed a permit to carry a handgun cannot be characterized as a routine booking inquiry.  Because Officer Suker had seen Defendant dispose of the gun as he led officers on a foot chase, Suker had reason to believe that the gun was possessed illegally.  Therefore, because the question about a handgun permit was likely to elicit an incriminating response, the Court recommends that Defendant's answer in response that question be suppressed.

13

As to Defendant's Sixth Amendment challenge, the <u>Miranda</u> right to counsel only attaches

when a suspect invokes the right during custodial interrogation by making clear and unequivocal request

for counsel.  See <u>Davis v. United States</u>, 512 U.S. 452, 458-59 (1994) (holding that defendant's

statement, "maybe I should talk to a lawyer," was ambiguous and did not require officers to clarify);

<u>Dormire v. Wilkinson</u>, 249 F.3d 801, 805 (8th Cir. 2001) (finding no clear invocation of right to

counsel because defendant's question, "Could I call my lawyer?" was ambiguous request for counsel),

<u>cert. denied</u>, 534 U.S. 962 (2001).  Here, there is absolutely no evidence that Defendant requested an

attorney.  Accordingly, his motion to suppress on Sixth  Amendment grounds should be denied.

**THEREFORE, IT IS HEREBY RECOMMENDED that:**

1.      Defendant's Motion to Suppress (Doc. No. 40) **be GRANTED**, **in part**, as to a

statement about possession of a gun permit, but **DENIED**, **in part**, as to all other

statements and evidence.

Dated: April 3, 2006

s/Susan Richard Nelson

SUSAN RICHARD NELSON

United States Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by **April 19, 2006,** after being served with a copy thereof.  The objecting party must file with the Clerk of the Court and serve on all parties, written objections which specifically identify the portions of the proposed findings, recommendations, or report to which objection is being made, and a brief in support thereof.  A party may respond to the objecting party's brief within ten days after service thereof. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek

review in the Court of Appeals.